*11727*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

T.K.B. SHIPPING A/S,

                                   Plaintiff,

         - against -

JH SHIPPING CO. LTD.,

                                   Defendant.
------------------------------------------------------x



Case No.

VERIFIED COMPLAINT

        Plaintiff, **T.K.B. SHIPPING A/S**, (hereinafter "TKB"), by its attorneys, **JUNGE**

**& MELE, LLP**, complaining of the Defendant, **JH SHIPPING CO. LTD.**, (hereinafter

"JH SHIPPING"), states and alleges the following upon information and belief:

        **1.**  This is a case of admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) and a

maritime claim within the meaning of Rules 9(h) and 38(e) of the Federal Rules of Civil

Procedure.

        **2.**  At all times relevant, Plaintiff **TBK** was a foreign corporation with a place of

business located at Strandvejen 102B, DK-2900 Hellerup, Copenhagen, Denmark, and

was the time charterer of the vessel ***BENEFIT WISDOM***.

        3.  At all times relevant, Defendant **JH SHIPPING** was foreign business

corporation and disponent owner of the vessel ***BENEFIT WISDOM***, with a place of

business located in Seoul, Korea, and is not present within this District, or any nearby

district, pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and

Maritime Claims of the Federal Rules of Civil Procedure.

**4.**  At all material times, Plaintiff, as time charterer, entered into a New York

Produce Exchange  ("NYPE") form voyage charter, dated March 23, 2007, for the vessel

**BENEFIT WISDOM**, with Defendant, as disponent owner, for a period of time ending

with re-delivery in the date range from October 1, 2007 to November 30, 2007, pursuant

to certain terms and conditions as more fully set forth in the "Fixture Recap" dated

March 23, 2007 and the said form NYPE time charter party, true copies of which are

annexed hereto as **Exhibit "1."**

**5.**  Thereafter, Plaintiff employed the said vessel in ocean commerce and abided

by the terms and conditions of the said time charter including the payment to Defendant

of all hire and other charges; however, on or about September 11, 2007, the Defendant,

without cause or justification, while said time charter was still in effect, withdrew the

vessel from the service of Plaintiff in breach of said time charter; a true copy of the

withdrawal message sent by Defendant to Plaintiff dated September 11, 2007 is annexed

hereto as **Exhibit "2."**

**6.**  Under the terms of Clause 17, lines 107 through 109, of the governing NYPE

form time charter party between Plaintiff and Defendant, disputes between the parties are

to resolved in arbitration at Singapore, under English law, and this proceeding is brought

in aid of said arbitration, either pending or contemplated.

**7.**  As best as same can now be estimated, Plaintiff expects to recover the

following amounts in the arbitration in Singapore: on the principal claim, $1,594,185.97,

for overpaid hire, bunker fuel on the vessel, overpaid charges, detention fines, and lost

earnings through November 30, 2007 at the daily rate of $11,000, as detailed in the message from Plaintiff dated September 11, 2007 and annexed hereto as **Exhibit "3"**; in addition Plaintiff will accrue interest, costs and attorney's fees through the end of arbitration in Singapore, in an amount yet to be determined, but is estimated to be about $100,000.00; for a total award amount of $1,694,185.97.

**8.** Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant is believed to have or will have during the pendency of this action, assets within this District consisting of cash, funds, freight, hire, or credits including but not limited to electronic fund transfers in the hands of garnishees in this District, including but not limited to the following:

1.    Citibank, N.A.

2.    Bank of America, N.A.

3.    Bank of New York

4.    Credit Suisse

5.    JPMorgan Chase Bank

6.    Commerce Bank

7.    HSBC (USA) Bank

8.    BNP Paribas

9.    ABN AMRO Bank

10.   Standard Chartered Bank

3

11.    UBS, A.G.

12.    Barclay's Bank

13.    Wachovia Bank

14.    Deutsche Bank and/or Deutsche Bank Trust Co. Americas

15.    American Express Bank

**WHEREFORE,** Plaintiff prays for the following relief:

1.    That process in due form of law according to the practice of this Court be issued against Defendant and that Defendant be cited to appear and answer the allegations herein;

2.    That, since Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendant's tangible or intangible property or any other funds held by garnishees including but not limited to the aforementioned garnishees in the District which are due and owing or otherwise the property of Defendant up to the amount of $1,694,185.97, to secure Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in this Verified Complaint.

3.    That such property attached pursuant to the Processes of Maritime Attachment and Garnishment remain sequestered to serve as security for the payment of

4

Plaintiff's claims as they may be embodied in any award issued out of arbitration in

Singapore.

       **4.**  That Plaintiff have such other and further and different relief as may be

just and proper, including judgment against Defendant, along with interest, costs and

disbursements as allowable under law.

Dated in the City of New York on September 12, 2007

                        Respectfully submitted,

                        JUNGE & MELE, LLP
                        *Attorneys for Plaintiff*

                        Peter A. Junge (PJ-0745)
                        29 Broadway
                        New York, NY 10006
                        (212) 269-0061

*11727 Verified Complaint.wpd*

<u>VERIFICATION</u>

PETER A. JUNGE declares as follows:

1.    I am a member of the bar of this Honorable Court and of the firm of Junge

& Mele, LLP, attorneys for Plaintiff.

2.    I have read the foregoing Complaint and I believe the contents thereof are

true.

3.    The reason this Verification is made by deponent and not be Plaintiff is that

Plaintiff is a foreign corporation, no officers or directors of whom are within this

jurisdiction.

4.    The sources of my information and belief are documents provided to me

and statements made to me by Plaintiff.

5.    I declare under penalty of perjury that the foregoing is true and correct.

Dated in the City of New York on September 12, 2007

_____
Peter A. Junge

```
=================================================================
Message Printed on 11-04-2007 15:12:10  By MM    RefNum: MM1348720
From/To: Ursachart S.A.
Addr: chartering@ursa.gr
Status : Incoming
=================================================================


From: "Ursachart S.A." <chartering@ursa.gr>
To: undisclosed-recipients:;
Subject: LgINT Message (REF:071ECC8  )
Date: Fri, 23 Mar 2007 12:32:48 +0200

TELiX MSG: 1ECC8 23/03/07 12:32

FM URSACHART / HP

TO OWNERS
TO CHARTS

RE: MV BENEFIT WISDOM / TKB
===
PLS FIND BELOW FIXTURE RECAP WITH ALL SUBS IN ORDER:

-mv benefit wisdom
 as desc in clause 71

-chtrs q'naires and matter of confirmation : pls send

for

-acct t.k.b. shipping a/s, copenhagen
-period on min/max dates ie tc upto 1 OCT/30 NOV 2007
-dely dlosp fancheng atdnshinc
-laycan 1/9 april 2007
-hire usd 17,650 pdpr
-c/e/v: usd 1500pmpr as per hd/cp
-ilohc: usd 2500lpsm(Nett usd 2.500 to be paid to master directly)
       last: usd 3.500lpsm
-bod/bor abt same qtty, bod abt ifo/mdo 338/49mt wog
 c/p price : ifo/mdo usd310/usd580 pmt.
-cargo as per cp. log/dirty cgo:chrts hv optn to load 1 log/1 dirty
 cgos by end apr 2007
 fm may to balance period charts hv optn to load 1(log)/2(dirty) cgos
 but always no to be allowed as last cgo.
-2.50 addc +1.25 to ursachart gr
-owise as per owners btb
CL 53 As per c/p -charts comment: ''but then we take it that vessel will
deliver with clean bottom'

and ofc with logical alter/amendments and what so far agreed on m/terms
E N D

Thank u very much for cooperation and fixture.

REGARDS


  .

      --------------- End of Message ---------------
```

EXHIBIT

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931 ; October 3rd, 1946

1  *This Time Charter Party* , made and concluded in .... .................. ... day of ..... , ......

2  Between

3  Owners of the good   *Panamanian* ..... steamship/Motorship ... *"BENEFIT WISDOM" (See Clause 71)* ..............of   *built in 1985*

4  of ................... tons gross register, and ................ tons net register, having engines of .............. .. indicated hose power

5  and which hull, machinery and equipment in a thoroughly efficient state, and classed ......................................................

6  at...................... of about ....... .............. cubic feet bale capacity, and about .  *23,542 metric* ..... ........tons of ~~2240 lbs.~~

7  deadweight capacity (cargo and bunkers, including fresh water and stores ~~not exceeding one and one half percent of ship's deadweight capacity,~~

    *lublicating oil and spare parts*

8  ~~allowing a minium of fifty tons)~~ on a dfaft ........... Feet ......... inches  on .............. Summer freeboard, inclusive of permanent bunkers,

9  which are of the capacity of about ...................................... tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about .  *12.0* . knots on a consumption of about .. *18 MT I.F.O. (.180CST)* . ~~tons of best Welsh coal best grade fuel oil best grade Diesel oil,~~

11  now   *trading* ........... ..........................................................................................

12  ............... and ............... as Charterers of the City of   .....................

13  **Witnesseth,**  that the said Owners agree to let, and the said Charterers  agree  to  hire  the  said  vessel, from the time of delivery, for

14  ~~about~~  *mlnimum months/maximum months,*

15  ...................................                                    within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any  part  of the time covered by this Charter, but Charterers remining  resposible for

17  the  fulfillment  of  this  Charter Party,   *Acceptance of delivery shall not constitute any waiver of  Owners' obligations hereunder.*

18  Vessel to be placed at the disposal of Charterers, at  *on dropping last outward sea pilot at one safe port, Taiwan, Hong Kong or Guangzhou, port*

    *in Owners' option  at  any  time day/night, Saturday, Sunday, Holiday included with Lay/Can   ,   or on dropping last outward*

19  *seapilot  at  one safe portin  Singapore /Japan range including South Korea and P.R.C.,  port in  Owners' option at any time day/night,*

    *Sunday, Saturday and Holiday included, with Lay/Can   , 2005*

20  ~~in  such dock  or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except  as otherwise provided  in clause No.6),  as~~

21  ~~the Charterers  may  direct. If such dock, wharf or place be not available time to count as provided  for in clause No.5.~~ Vessel  on  her delivery to be

22  ready to receive cargo with clean swept holds *(see Cl.32)* and tight, staunch,. Strong and in every way fitted for the *any permissible cargo* service,

    having water Ballast, *cranes* winch and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, the other power sufficient to run  all the *cranes* winches at one and

24  the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying  lawful

25  merchandise, ~~including petroleum or its products, in proper containers,  excluding~~  *In  such lawful  trades  between  safe port and/or ports.*

26  ~~(vessel  is not to be  employed in the carriage of Live Stock, but  Charterers  are to have  the privilege of shipping a small number on deck at their risk,~~

27  ~~all necessary fittings and other requirements  to be for account of Charterers), In such lawful trades,  between safe port and/or  ports in British North~~

28  ~~America,  and/or  United States of America, and/or  West Indies,  and/or  Central America, and/or  Caribbean Sea,  and/or  Gulf of Mexico,  and/or~~

29  ~~Mexico, and/or  South America~~ .. ....................... ............................. ............................ ~~and/or  Europe~~

30  ~~and/or  Africa, and/or  Asia, and/or  Australia, and/or  Tasmania,  and/or  New Zealand,  but excluding  Magdalena River, River St. Lawrence between~~

31  ~~October  31st and  May  15th, Hudson Bay  and  all unsafe  ports;  also excluding,  when  out  of  season,  white  Sea, Black  Sea and  the Baltic,~~

32  *See Clause 29* .............................................................................................

33  ..................................................................................................

34  ..................................................................................................

35  as the Charterers or their Agents shall direct, on the following conditions;

36  1.  That *whilst vessel on-hire* the Owners shall provide and pay for all provisions, wages and *immigration* consular shipping and discharging fees

    of the crew; *also consular fees  pertaining to vessel's nationality or flag and all garbage removal except hold  cleaning,* shall pay for the

37  insurance  of  the  vessel, also for all the cabin,  deck,  engine-room and other necessary stores, including boilerwater *freesh  water for domestic*

    *consumption and lubricating oil* and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery, *holds and cargo spaces* and equipment *with all certificates necessary to*

    *comply with  the current requirements at ports of call and canals for and during the service, failing which Owners are responsible*

    *for all time lost and expenses incurred thereby* for and during the service.

39  2.  That *whilst vessel on-hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed,Port Charges,Pilotages, *compulsory*

    *and customary pilotages, boatage on Charterers' business, tug-assistance* Agencies, Commission,

40   Counsular Charges (except those pertaining to the Crew), and all other usual charges except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigation ordered because of cargoes carried or ports visited while vessel employed under this

43   charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44   of six months or more.

45      Charterers are to provide necessary *lashing/securing materials, slings* dunnage and shifting boards, also any fittings requisite for a special

     trade or unusual cargo, but

46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47   for dunnage, they making good any damage thereto.

48      3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49   board the vessel *as per Clause 55* at the current prices in the respective ports, the vessel to be delivered with not less than . . . . . . . . . . . . . tons and

50   not more than . . . . . . . . . . . . . . . . . . tons and to be re-delivered with not less than . . . . . . . . . . . . . . . . . . tons and not more than . . . . . . . . . . . . . . . tons

51      4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of . . . ***XXXX*** . . . . . . . . . . . . *as arranged* . . . . . . . . . . . . . . . . . . . . . .

52   . . . . . . . . . . . United States Currency per *day prorata including overtime*  . ton on vessel's total deadweight carrying capacity, including bunkers and

53   stores, on . . . . . . . . . . . . . . . . . . . . . . . . . summer breeboard, per Calendar Month, commencing on and from the day of her delivery, as foresaid, and at

54   and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition,

     *fair wear and tear excepted* ordinary       *Hire to be computed in G.M.T.*

55   wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot*

     **or passing one safe port port in Charterers' option within PMO/Japan range in**

     **which case the port to be on the mainland only and no island except East coast or Sumatera,**

     **North coast of Jawa within Jakarta/Surabaya range, North coast of Borneo, Luzon(Philippines)**

     **including Korea / Japan Island, Taiwan not to be the last discharge port (or redelivery port)**

     **or in Charterers' option. Buenos aires/Boston range or in Charterers' option. Skaw/Passero**

     **range any time day or night, Sundays and Holidays included.**

56   unless otherwise mutually agreed.  Charterers are to give Owners

     not less than   25/20/15/10/  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . days *approximate*

57   notice of vessels expected date of re-delivery, and probable port. And 8/6/4/3/2/1 day(s) definite notice.

58      5.   Payment of said hire to be made *by T.T. remittance to the Owners' nominated bank in*  in New York in cash in United Sates

     Currency,  semi-monthly in advance, and for the last half month or

59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61   hire, or bank guarantee,or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers,

62   without prejudice to any claim they (the Owners) may otherwise have on the Charterers.  ***Charterers have the privilege to deduct from last***

     ***sufficient hire payment (s) ( or any other payments due to Owners where the last hire payments are insufficient to cover same)***

     ***estimated value of bunkers remaining on board on redelivery and Owners' disbursements*** (See also Clause 46)Time to count from 7 a.m.

     on the working day.

63   following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers, they

64   to have the privilege of using vessel at once, such time used to count as hire.

65      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain,  by the Charterers or their Agents, subject

66   to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67   of such advances.

68      6.   That the cargo or cargoes be laden and / or discharged in any dock or at any wharf or place that Charterers or their Agents may

69   direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *Buenaventura, River Plate and Amazon River only*

70   where is customary for similar size vessels to safely lie aground.

71      7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72   accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73   tackle, apparel, funiture, provisions, stores and fuel. Chaterers have the privilege of passengers as far as accommodations allows, Charterers

74   paying Owners . . . . . . . . . . . . . . per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

75   incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76      8.   That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and

77   boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employments and

78   agency, and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their expense under the supervision of the Captain, who is

     to sign Bills of Lading for

79   Cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *(See Clause 70)*

80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and if necessary, make a change in the appointments. *But this provision does not affect*

*Charterers' right to advance any claim or require Arbitration under Clause 17 on dispute regarding the conduct of the Master*

*in prosecution of the voyage and in carrying out the orders and directions of the Charterers.*

82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of *US$9.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling~~ *(See Cl.49)*

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agent, and furnish the Charterers,

88  *or* their agents or Supercargo, when required, with true copy of daily logs in *English,* showing the course of the vessel and distance run and the

89  consumption of fuel.

90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.

91  13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

92  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

93  ~~on giving written notice thereof to the Owners or their Agents . . . . . . . . days previous to the expiration of the first named term, or any declared option.~~

94  14.  That if required by Charterers, time not to commence before . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . and should vessel not have

95  given written notice of readiness on or before . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~but not later than 4 p.m.~~ Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.    *Owners to give Charterers*

*20/15 days approximate delivery notice with probable port and 10/7/5/3/1 days definite delivery notice with port.*

*Lay/Can shall be   ,   or   ,  which to be agreed later on.*

97  15.  That in the event of the loss of time from *default and/or* deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for purpose of examination or painting bottom, or by any other cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; *until the vessel returns to the same or*

*equivalent position* and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra expenses shall be deducted from the hire. *duly supported by vouchers*

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of the God, enemies, fire, restraint of Prices, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *arbitrators* three persons at

~~New York,~~ *Singapore in English Law*

108  one to be appointed by each of the parties hereto, and the third by the two so chosen; decision or that of any two of them, shall be final, and for

the purpose of enforcing any award, this agreement may be made a rule or the Court. The Arbitrators shall be commercial men.

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average

111  contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents,

113  which might have priority over the title and interest of the owners in the vessel.

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115  Crew's proportion. General Average shall be adjusted, stated and settled *in Singapore in English Law,* according to ~~Rules 1 to 15, inclusive 17 to 22~~

~~inclusive , and Rule F of~~

116  York-Antwerp Rule *1994 or any amendment thereto* ~~1924, at such port or place in the United States as may be selected by the carrier,~~ and

as to matters not provided for by these

117  Rules, according to the laws and usages at the port of ~~New York~~ *Singapore in English Law.* In such adjustment disbursements in foreign

currencies shall be exchanged into

118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

119  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement

120  or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods, Such cash deposit as the carrier

121  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

122  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option o f  the

123  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

125 United States money.

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, or which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods, if an salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~

132    Provision as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20.  Fuel by the vessel while off hire, also for ~~cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the

134 cost of replacing same, to be allowed by Owners.

135 21.  ~~That as the vessel may be from time to time employed in tropical waters during the terms of this Charter, Vessel is to be docked at a~~

136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service, . (See Cl.66)~~

138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

140 22.  Owners shall maintain the gear of the ship as fitted,  providing gear ( for all *cranes* derricks) capable of handling lifts *as per Cl.71.* ~~upto three~~

~~tons, also~~

141 providing ropes, falls, slings and blocks *as on board.* If vessel is ~~fitted with derricks capable of handling~~ heavier lifts, ~~Owners are to provide necessary~~

~~gear for same, otherwise~~ equipment and gear for heavier lifts shall be for Charterers' account. Owners also provide on the vessel *lights* *as on board*

~~lanterns and oil for~~

143 night work, and vessel to give use of electric light when so fitted, but additional lights over those on board to be at Charterers' expense. The

144 Charterers to have the use of any gear on board the vessel.

145 23.  Vessel to work night and day, if required by Charterers, and all *cranes* winches to be at Charterers' disposal during loading and discharging;

146 ~~steamer to provide on winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148 ~~port, or labor unions, prevent crew from driving winches,~~ shore *crane driver* Winchmen to be *employed and* paid by Charterers. In the event

of a disabled *crane* winch or *cranes* winches, of

149 in sufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned

150 thereby.

151 24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;

153 etc", in respect of all cargo shipped under this charter to or from the United States of America. ~~It is further subject to the following clauses, both~~

154 ~~of which are to be included in all bills of lading issued hereunder.~~

155                                   ~~U.S.A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160                                   ~~Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging.

170 26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the

171 navigation or the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

172 27.  A commission of 1.25 percent is payable by the Vessel and Owners to

173 . . . . . . . . . . . . . . . . . . . . . .

174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175  28.  An address commission of 2 1/2 per cent payable to *Charterers* . . . . . . . . . . . . . . . . . . . . . . . . on the hire earned and paid under this Charter.

*Clauses 29 to 79 inclusive as attached, to be considered fully incorporated in this Charter Party.*

*Owners* :                                  *Charterers* :

Rider to Charter Party dated _____ - M.S. "BENEFIT WISDOM"

29. Trading Limit

Vessel to always trade within I.W.L., Charterers have option to breach of I.W.L. subject to Owners' underwriters approval and invoice, always afloat at any time of tide, Charterers' option NAABSA, always via safe port(s)/berth(s) excluding Israel, Cuba, North Korea, Yemen, Cambodia, Great Lakes, Lebanon, Syria, places subject to U.N.sanctions, areas prohibited by vessel's war risks underwriters due to war or war-like activities, and places which may be excluded by the authority of vessel's flag..

Charterers have option to trade vessel to C.I.S. Russian Far East on the following conditions : -

1) Charterers to arrange for phytosanitary inspection to be carried out and phytosanitary certificate valid for all countries issued by official inspectors to be placed on board the vessel at Charterers time and expense prior to vessel's sailing from C.I.S. Russian Far East port.

2) Breach of I.W.L. to be for Charterers account and the additional premium for such breach to be paid by Charterers in advance prior to such breach upon Owners faxing their underwriters/brokers' invoice.

3) Vessel not to be ordered to ice-bound ports/areas.

Vessel is not to trade direct between People's Republic China and Taiwan.

30. Stevedore Damage

Stevedore to be appointed and paid by the Charterers but to work under supervision of the Master. Should any damage be caused to the Vessel or her fittings by the stevedores, the Master has to try to let the stevedores repair such damage and try to settle the matter directly with them.

The Charterers shall not be responsible for any damage caused by stevedores to the Vessel unless the Master obtains written acknowledgment of the damage and liability or written receipt of Master's damage notice from the concerned stevedores and immediately notifies the Charterers or their agents of such damage with details within 24 hours from the occurrence except in case of hidden damage which to be notified as soon as discovered prior to completion of the particular voyage.

The Charterers shall have the liberty to redeliver the vessel without repairing the damage for which the Charterers are responsible, as long as the same do not affect the vessel's seaworthiness, but the Charterers undertake to reimburse costs of repair against the production of repair bills by repairers or dockyard unless otherwise agreed.

31. Joint On/Off Hire Survey

On/off hire survey to be held jointly at the delivery/redelivery ports to ascertain vessel's condition and quantity of bunkers remaining on board by Owners and Charterers.

The cost to be equally shared but in Owners' time on delivery and in Charterers time on redelivery.

32. Hold Condition on Delivery and Redelivery

The vessel's holds on arrival at first loading port to be water washed, dried up and completely clean through and in all respects ready to receive Charterers' intended cargo and pass Shippers' inspection, failing which vessel to be off-hire until passing the reinspection and Owners to pay all expenses incurred resulting from such failure.

The vessel shall be redelivered by the Charterers to the Owners with clean swept holds. However the Charterers shall have the option to redeliver the Vessel with holds as are discharged and left by stevedores, in consideration of which the Charterers shall pay a lump sum compensation of US$ XXXX to the Owners including removal/disposal of barks/dunnage or residue from Charterers' last cargo.

33. Equipment

The Vessel shall be in possession of International Cargo Gear Certificate showing that all gears in order which to be shown to Charterers or their agents, if required by them.

34. Deviation/Put Back

In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back whilst on voyage caused by sickness of or an accident to the Master/Officers/Crew, or caused by stowaway, refugee or any person on board the Vessel other than persons travelling by request of Charterers by the act or neglect of Charterers, or by reasons of refusal of Master or Officers or Crew to perform their duties or of an accident or breakdown to vessel or dry-docking or periodical survey, or salvage or any alleged pollution damage, hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until the Vessel is again efficient in the same or equivalent position where the vessel is originally destined for and voyage resumed therefrom, and all expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account.

35. Grab Discharge

The Vessel is properly reinforced tank top for grab discharge.

36. Quarantine/Radio Pratique

Normal quarantine time and expenses for the Vessel's entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness and etc., of Master, Officers and Crew shall be for the Owners' account. Further the Vessel shall prepare radio pratique at port or ports where radio pratique available.

37. Deratting Certificate

The Vessel shall be delivered with valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this Charter, cost of renewal of certificate and fumigation if necessary shall be for the Owners' account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

38. New Jason Clause, New Both-to-Blame Collision Clause, War Clause, etc.

New Jason Clauses, New Both-to-Blame Collision Clause, Baltime 1939 War Clause, Chamber of Shipping Clause Paramount, as attached, to be considered fully incorporated in this Charter Party and to be included, as appropriate, in Bills of Lading issued under this Charter Party. U.S.A. Clause Paramount and Canadian Clause Paramount, as also attached, to be considered fully incorporated in this Charter Party and to be included, as appropriate, in Bills of Lading issued under this Charter Party in respect of all cargo shipped under this charter to or from the U.S.A. and the Canada respectively.

39. Cargo Gear

The Vessel can work all gear simultaneously. With reference to Clause 15 and 23, in the event of break-down of cranes/derricks by reason of disablement or insufficient power, the hire is to be reduced pro-rata for period of such inefficiency in relation to the number of cranes/derricks available. The Owners to pay in addition to the cost of labour affected by breakdown either waiting for resumption of work or additionally engaged . This does not exempt the Owners from liability for cost of hiring shore appliance, but hire shall not be reduced if shore appliances are substituted, on the Owners' account, for cranes that are out of action due to the reason stated above

Charterers have the option to conduct survey/test on vessel's gears anytime during the currency of this time charter period. If found to be not in full working capacity, Owners to immediately rectify the problems and all cost/time loss to be for Owners' account.

40. Return Premium

The Charterers to have the benefit of any return of insurance premium receivable by the Owners from Underwriters (as and when received from the Underwriters) by reason of the Vessel being in port for a minimum of 30 days, provided the Vessel is on-hire.

41. War Risk Insurance

Basic war risk insurance premium for worldwide trading shall be for the Owners' account and additional premiums for hull and machinery and the Officers/Crew as well as crew war bonus due to the Vessel's trading to the restricted area shall be for the Charterers' account.

Underwriters    :    Chung Kou Insurance Co., Ltd.
Insured value for Hull and Machinery   :    U.S.$10,000,000.00

42. War Cancellation

If major war breaks out between any two or more of the following countries : United Kingdom, U.S.A., Russia, People's Republic of China, Japan, dirctly affecting the performance of this Charter, both the Owners and the Charterers shall have the option of canceling this Charter. Whereupon the Charterers shall redeliver the Vessel to the Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by the Charterers. In all cases hire shall be paid until the Vessel's redelivery.

43. Watchmen

Watchmen for cargo to be for the Charterers account. Ordinary watchmen for ship's crew property/ protection etc., to be for the Owners' account. But gangway watchmen, if required by the port authorities, which to be equally shared by the Charterers and the Owners.

44. Itinerary of Vessel

The Charterers undertake to keep the Owners informed during Charter Party period as regard as itinerary of the Vessel and names of agents at port of call.

45. Cash Advance

The Charterers shall not be obliged to advance cash to the Master unless mutually agreed, and the same to be deducted from hire in advance.

46. Owners' Agents

The Owners to appoint their own agents for repairs, average and also for any other Owners' business when requested by the Charterers. The Owners are always entitled to avail themselves, without agency fee to the Owners, of the Charterers' agents for crew mail and similar normal minor Vessel's items as far as agents can manage.

47. Taxes/Dues/Charges

Any Taxes and/or dues and/or charges whatsoever, imposed on cargo and/or freight by any local or national authorities, arising out of the trade under this Charter Party, to be born by the Charterers.

48. Charterers' Colours and Flag

The Charterers have the liberty of flying their own house flag and painting the funnel to their own colours. Time and expenses for painting the funnel initially or any time during the currency of the Charter shall be for the Charterers' account. The funnel shall be repainted to the Owners' colours prior to redelivery in the Charterers' time and expenses.

49. Lump Sum Amount for Cable/Victualling

The Charterers to pay the Owners lumpsum U.S.$**XXXX** monthly or pro rata in lieu of communication fee, such as telephone, radiograms, telexes, victualling and entertainment for the Charterers' business. lumpsum U.S.$ **XXXX**  for crew's

intermediate hold cleaning including removal/disposal of dunnages to be paid to Owners by Charterers

together with hire.

This lumpsum amount shall be reviewed and revised on the basis of Owners' actual figures on preceding year.

This Payment shall simultaneously be made with hire payment.

50. P. and I. Club

The Owners guarantee that the Vessel shall be fully covered by The Standard.

The Charterers have the benefit of the Owners cover granted by the P. & I. Club as far as the rules permits.

51. Master & Crew

The Owners undertake to do their utmost to obtain good Master, Officers and Crew.

Master must perform the self pilotage as much as possible at Japanese ports and master's self pilotage bonus to be negotiated directly with master.

52. When Manoeuvering

The Vessel uses diesel oil for main engine when manoeuvering in narrow water, canals, rivers, in and out of port.

53. Fouling Bottom

In the event of the Charterers ordering the vessel to port(s) where vessel's stay is more than 15 consecutive days or to lay-up so as to cause bottom fouling. Charterers to clean vessel at their time and expense, otherwise Owners' representation of vessel's vessel's speed/consumption to be non operative from time of sailing such port(s) until vessel's next dry dock, such fouling affecting speed to be evidenced through a joint divers' inspection. Cost for same to be for Owners' account and time to be for Charterers' account.

54. Panama/Suez Canal Transit

During full currency of this Charter Party, the Owners shall keep the Vessel fully capable and equipped to transit the Panama Canal and Suez Canal in accordance with the Rules and Regulations governing navigation of the canals mentioned herein promulgated from time to time by the local authorities.

55. Bunkers on Delivery/Redelivery

The Vessel to be delivered with bunkers on board (IFO about xxx tons and MDO about xxx tons) and to be redelivered with bunkers about same quantities as on delivery.

The Charterers to have the liberty to bunker the Vessel prior to delivery for their own account provided this does not interfere with Owners work. The Owners are allowed to replenish bunkers before redelivery at the Owners' expenses and time subject to the Charterers' prior approval which shall be not be unreasonably withheld.

Bunker Prices shall be U.S.$xxx per metric ton for Fuel Oil (180 CST) and U.S.$xxx

per metric ton for Diesel Oil.

The Charterers to pay the value of the bunkers on board on delivery with first hire payment and have
the right to deduct the estimated value of the bunkers on redelivery from the last sufficient hire payment.

56. Oil Pollution

(a) If the Owners are required to establish or maintain financial security or responsibility in respect of
oil or other pollution damage to enable the Vessel lawful to enter, remain in on leave any port,
place, territorial or contiguous waters or exclusive economic zone of any country or state in
performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise
may be necessitated to satisfy such requirements at Owners' sole expense.

(b) The Charterers shall be under no responsibility for all consequences (including loss of time) of oil
or other pollution damage and any failure or inability of the Owners to do so as provided for the
above and any loss of time incurred thereby shall be off-hire, unless the same shall be due to the
default of Charterers.

( c ) The Owners shall indemnify and hold the Charterers harmless against all consequence (including
fines if any imposed to the Charterers) of oil or other pollution damage unless due to Charterers
and any failure or inability of the Owners to do so as provided for in the preceding paragraph(a).

In connection with the preceding paragraph(a) , a particular reference is made to a certificate of
Financial Responsibility in compliance with requirements of the U.S. Federal Water Pollution Act
as amended, the Oil Pollution Act of 1990, the Comprehensive Environmental Response Compensa-
tion and Liability Act as amended, and any amendment thereto.

(d) The Owners warrant that the vessel is entered with the protection and indemnity insurer listed in
Charter Party for the full coverage available for marine pollution risks. In the event the Owners
fail to undertake such measures, the Charterers may, at their option, upon notice to the Owners or
the Master, do so themselves and any measures taken by the Charterers shall be deemed taken
on the Owners' authority and as the Owners' agents, and shall be at Owners' expenses except to
the extent that any such pollution damage or threat was caused or contributed to the Charterers.
The Owners to be responsible for and to comply with local regulations.

COFR Number :

57. Preparation for Loading and Discharging

The Vessel's officers and crew shall perform shaping up of the Vessel's hatches and gangway prior to
and upon arrival at port in order to commence loading and/or discharging operation without delay.
Opening and closing of all hatch covers shall be performed by the officers and crew in addition to usual
operations performed by them with free costs to the Charterers and unless prohibited by port regulations.

58. Boycott

Hire shall not be due for any time lost by reason of any boycott or any blacklisting or any threat to boycott or blacklist the Vessel on any account of her flag, nationality or her registry, her ownership or management, the nationality of any member of her crew or the terms on which the crew are engaged and the Owners shall remain responsible for all consequential costs that may be incurred by the Charterers.

59. ITF

The Owners guarantee that the minimum terms and conditions on employment of the crew of the Vessel are now or will be prior to the delivery of the Vessel into this charter, covered by a BONA FIDE TRADE UNION AGREEMENT acceptable to ITF and their local affiliates. If the Vessel does not meet these requirements at any time during the currency of the Charter, the Vessel is to go off-hire for the time lost thereby until such requirements are fully complied with and any costs involved, including shore labour stand-by time, to be for Owners' account.

60. Grace Period

Referring the lines 60 and 61, where there is failure to make "punctual and regular payment" of hire the Charterers shall be given by Owners two(2) banking working days written notice to rectify the failure, and when so rectified within those two(2) days following Owners' notice, the payment shall stand a regular and punctual and the Owners will not withdraw the Vessel.

61. Arrest

Should the Vessel be arrested during the currency of this Charter Party, at the suit of any person having or purporting to have a claim against or any interest in the Vessel, not arising from this Charter Party, hire under this Charter Party shall not be payable in respect of any period whilst the Vessel remains under arrest or remains unemployed as the result of such arrest, and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter Party in respect of any period during which by virtue of the operation under this clause, no hire is payable. This clause is inoperable should the arrest be caused by the act or omission default of the Charterers or their agents.

62. Blacklist

The Owners guarantee that the Vessel is not Arab blacklisted and is not blacklisted by any of vessel's calling ports and countries under this charter.

63. Breaking I.W.L.

The Charterers have the right to break Institute Warranties Limits, subject to the Owners hull underwriters' prior approval, with the Charterers giving due notice well in advance to the Owners for that purpose.

The Charterers to reimburse extra insurance incurred thereby and but as per Lloyd's equivalent amount are entitled to have the benefit of any discounts received by the Owners for such extra insurance.

64. Steel Coils

The Owners guarantee the Vessel can load steel coils in all holds provided loaded, stowed, lashed and secured with wooden battens places on tank tops, all to be in accordance with Master's and/or Lloyd's Surveyors requirements and not exceeding respective tank top strength

65. Inter-Club NYPE Agreement

Notwithstanding anything contained herein to the contrary, it is expressly agreed that all cargo claims will be apportioned in accordance with the Inter-Club New York Produce Exchange Agreement (as amended May, 1984).

66. Drydocking

The Owners have the option to place the vessel in
dry-dock during the currency of this charter at a convenient time and
place to be mutually agreed between the Owners and the Charterers .
However, the Owners shall notify the Charterers of the intention of
such dry-docking and/or periodical survey with two (2) months prior
notice except emergency case.
Owners intention of drydock place would be preferred Shanghai to
S.China range with period on apr to dec 2007.
Charterers endeavor to bring vessel to this range.

67. Cargo Exclusions

It is understood that the vessel is not to be employed in the carriage of cement in bulk, raw cotton, livestock, injurious, inflammable or dangerous goods (such as acids, explosives, arms, ammunition or warlike materials, nuclear or radioactive products or wastes or chemical products), calcium carbide, ferro-silicon, naphtha, motor spirit, tar or any of their products, ammonium nitrate (see below), direct reduced iron pellets, hide, petroleum or it's products (but petroleum coke allowed), pitch in bulk, scrap, motor blocks and turnings. Charterers are not allowed to load Indonesian round logs, unless Indonesian government declares the export "re-open" and Charterers hold valid export license.
Log's shipment three (3) voyages maximum in a year, especially the Indian round logs ex Sarawak, PNG and Solomon are not allowed.

Cargo listed in the IMDG Code should be subject to Owners' prior approval and to be loaded strictly in accordance with IMO and local rules and regulations.

Concentrates are permitted provided always loaded in line with IMO/local regulations.

Ammonium nitrate of Fertilizer grade to be allowed.

Charterers to have the option to carry five (5) voyages in total out of salt and/or sulphur and/or petroleum coke during each year(12 months) but sulphur or salt or petroleum coke not to be carried

as last cargo under this time charter.

If vessel carrying petroleum coke on the intermediate voyage of this Charter then Charterers to responsible the vessel with holds cleaned up to grain holds standard and no hold cleaning compensation falls due to Owners.

A) Prior to loading of salt or sulphur :
   Depending on the standard of hold coatings partially lime wash the holds (this is done generally upto a level equal to the top of the lower wing tanks).

B) After discharging of salt or sulphur :
   Sweep and wash down hold. Rinse and flush bilges and bilge lines with fresh water.

C) In case crew are requested to do above works by Charterers, crew will render utmost assistance provided weather and time between last discharge port and next loading port allows,  as far as possible, without responsibility of the result, Charterers paying a bonus direct to crew for each operation for applying and removing apart from hold cleaning bonus as Master and Charterers mutually agreed, but arrangement/time/expense including cost of material are always for Charterers' account.

In case bagged rice is carried, Owners are not responsible for all bags torn/shortlanded/damaged/ leakage/pilferage except for ones wetted or other damage caused by vessel's unseaworthiness.

68. The Charterers are to have the option of loading lawful cargo on deck at their risk and expenses within the visibility/stability, trim and deck strength but always subject to the Master's satisfaction.

69. Lightening
   If so required by the Charterers, the Vessel may be ordered to load or discharge into a seagoing vessel alongside at a recognized safe lightening place inside or off a port. The Charterers to provide adequate fenders and lines for the operation and to pay all extra expenses involved, including any/all extra insurance. The whole operation to be to the Master's satisfaction with regard to the safety of the Vessel.

   Delivery over side into the other vessel in the case of discharging to constitute right and true delivery under the relative Bills of Lading for that voyage. All stevedoring and tallying to be performed by the Charterers. The Charterers to give the Owners 96 hours where possible, otherwise as soon as possible, clear notice of their intention to perform such operation, advising approximate type and quantity of cargo involved, the other vessel concerned, ultimate destination of cargo and location of operation.

70. Bill(s) of Lading
   Notwithstanding the provisions of clause 8, the Charterers and/or their Agents are hereby authorized to sign on Master and/or the Owners' behalf Bills of Lading as presented strictly in accordance with Mate's or Tally Clerks receipt without prejudice to this Charter Party but the Charterers to be respon-sible for all consequence that might result from the Charterers and their Agents signing Bills of Lading

not adhering to the remarks in the Mate's or Tally Clerks receipt.

Charterers' Bills of Lading to be used.
The Charterers and/or their agents may alternatively issue and sign Sea Waybills in lieu of Bills of Lading for those shippers with whom Charterers have the contracts allowing or requiring Sea Waybills to be used. Such Sea Waybills must however include all terms, conditions, exceptions against liability that are contained in Charterers' usual form of Bill of Lading, Charterers shall further indemnify and hold Owners harmless from all consequences arising out of the issuance of Sea Waybills in lieu of Bills of Lading.

Should original Bill(s) of Lading not arrive at discharging port(s) in time then the Charterers may request the Owners to release entire cargo without presentation of original Bill(s) of Lading, and the Charterers hereby state that they shall indemnify the Owners against all consequences arising from the Owners conforming to the Charterers' request in releasing cargo without original Bill(s) of Lading .
The Charterers are to issue single Letter of Indemnity in accordance with Owners' P and I Club wording signed by the Charterers and to be telexed  or faxed to the Owners prior to commence the discharging.
The Original Letter of Indemnity is to be couriered to the Owners or Owners Agents and/or Master at discharging port(s) as soon as possible.

71. Vessel's Particular (All details about)

Name :  M.S. "BENEFIT WISDOM"   (Ex name : "kalinda")
             Flag Panama  /  Built in Mar.1985 /  Classed at C.R.  /  Single Deck Log Bulk Carrier
             Call Sign : 3ESJ3  /  Official No. : 15009-85-F  /  IMO No. : 8412948
             Inmarsat C : 435295810 BENE X   /    E-mail address : 435295810@stratosmobile.net

DWT in  Summer          23,542 metric tons on 10.068 metres
        Winter              22,864 metric tons on 9.89 metres
        Tropical            24,222 metric tons on 10.277 metrs
        Fresh water        23,500 metric tons on 10.29 metrs
        Tropica fresh water   24,200 metric tons on 10.59 mtres

L.O.A. / Beam / Depth : 155.906 / 24.60 /  13.90 metres

International G.R.T. / N.R.T. : 13,635.00 / 7,956.00
Suez G.R.T. / N.R.T. : 13,807.00 / 11,601.08
Panama G.R.T. / N.R.T. : 14,249.00 / 11,183.70

Number of Hold/Hatches :  4 Holds / 4 Hatches
Hatch Size : No. 1    - 14.40 x 11.20 metres
              Nos. 2/4 - 25.60 x 13.20 metres

Hatch covers Type : Steel Pontoon

Grain / Bale Capacity : 29,630.98 / 28,163.39 CBM
Holdwise Grain : No.1/2/3/4   4,150.10 / 8,729.11 / 8,715.61 / 8,036.16 CBM
            Bale : No.1/2/3/4   3,785.97 / 8,334.13 / 8,353.75 / 7,689.54 CBM

Strength : Tank Top  10.38 MT/M2
        Upper Deck  3.5 MT/M2
        Hatch Cover  2.4 - 3.0 MT/M2

Cargo Gears :  2 Deck Cranes x 25.5 long tons and 2 Thomson Derricks x 25 long tons

Speed / Consumption :
About 12.0 knots on about 18.0 MT I.F.O.9180CST) and about 1.0 MT M.D.O.
Under good weather condition upto/maximum Beaufort Scale Force 4 and Douglas
Sea State and no adverse current : -

Consumption in port :
Working : about 1.0 MT I.F.O. (180CST) and about 2.0 MT M.D.O.
Idle    : about 0.8 MT I.F.O. (180CST) and about 0.8 MT M.D.O.

Bunker Spec : I.F.O. 180 CST RME 25  /  M.G.O.(DMX) or M.D.O.(DMB)

Flat Tank Top Demension in each Hold :
            fore   /   aft   /   length
No.1 :  3.04  m / 18.48 m / 20.8 m
No.2 :  20.87  /  23.67  / 31.2
No.3 :  23.67  /  23.67  / 31.2
No.4 :  20.97  /   8.52  / 28

Aiir Draft : (summer draft)
general cargo : 37.532 m
timber (log) : 37.162 m

Moulded Depth : 13.9 m

Gear (Derricks & Cranes) Outreach :
boom length and S.W.L. at max radius on topping angle 15 degree:
No.1 (derrick) : 20.6 m  S.W.L. 21 L/T
No.2 (crane)  : 26.1 m        17 L/T
No.3 (crane)  : 26.1 m        17 L/T
No.4 (derrick) : 28.8 m        21 L/T

boom length and S.W.L. at max radius on topping angle 25 degree:

No.1 (derrick) : 19.3 m  S.W.L.  25 L/T
No.2 (crane) :  24.5 m          25.5 L/T
No.3 (crane) :  24.5 m          25.5 L/T
No.4 (derrick) : 27 m           25 L/T

Water Line to Hatch Coming : 13.38 metres in light ballast
                             10.40 metres in heavy ballast

Main Engine Maker / Type : Kobe Diesel Co.,Ltd / 6UES 52L
           Power x RPM : 6,250 PS X 119 RPM

Tank Capacity : I.F.O.  1,215.73 M3 (100%)     M.D.O.  150.49 M3 (100%)
                I.F.O 923 MT (ABOUT 80%)   M.D.O 102 MT (ABOUT 80%)
                Water Ballast  6,464.13 M3 (100%)     Fresh Water  485.10 M3 (100%)

Number & Nationality of Master/Crew : Total 22 persons at present (Master and C/E are Taiwan, Oth

P & I Club : Standard Steamship Owners P & I

SMC/DOC Issued & Valid date : SMC issued on 23rd Jan. 2003 valid till 27th May 2007
                             DOC issued on 07th Jan. 2003 valid till 14th May 2007

Last Dry Dock / Special Survey Date : 12th Apr. 2002 / 06th Apr. 2002
Next Dry Dock / Special Survey Date : 05th Apr, 2005 / 05th Apr. 2005

Holds ventilation type: mechanical

Owners to guarantee that Vessel is Log/Grain/Aussie/CO2 fitted.

72. ISM Clause

The Owners guarantee that both the Vessel and "the Company" (as defined by ISM Code)
are certified under the ISM Code and will remain so for duration of this Charter Party.
If required, the Owners to provide the Charterers with a copy of the relevant Document of
Compliance (DOC) and Safety Management Certificate (SMC). Notwithstanding anything to
the company in this Charter Party, the Owners to remain fully responsible for any and all
consequences of their failure to comply with the requirements of this clause.

73. Intermediate Hold Cleaning and Extra Work

If the vessel's officer and crew perform extra work, as far as they are available and free from other
duties and permitted by the port regulation, the Charterers shall pay a compensation for the works

according to the tariff. However, the both parties agreed to review the tariff for succeeding year of the charter party if any.

Upon Completion of discharge of each cargo, the crew shall render customary assistance in cleaning cargo holds in preparation of next loading. The crew will endeavour to affect (sic) such cleaning as best as possible. The Owners shall not be responsible for any consequences arising from the fact that the crew has been employed in the clean and the vessel shall always remain on hire.

Intermediate hold cleaning to be performed by crew if requested by Charterers, provided time/sea conditions allowed and permitted by local regulations. Lumpsum U.S.$ XXXX per voyage for crew's intermediate hold cleaning including removal/disposal of dunnages to be paid to Owners together with hire. All necessary cleaning materials to be supplied by the Charterers. Owners/crew to give their best cooperation in this respect, but are not responsible for such cleaning.

74. Smuggling

The Owners are familiar with the U.S. Customs Service Sea Carrier Initiative Agreement which is designed to discourage the smuggling of illegal contraband, including but is not limited to narcotics.

The Owners shall comply with the terms of the U.S. Customs Service Sea Carrier Initiative Agreement, and will take all security measures recommended by U.S. Customs, including those described in the sea carrier security manual.

Any delay, expenses and/or fine incurred on account of smuggling shall be for the Owners account if caused by the officers and/or crew, or shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

Both the Owners and the Charterers warrant that they are signatories to the United States Sea Carrier Initiative Agreement with U.S. Custom Service.

75. Loading Logs Materials

The vessel to be fully log fitted as on board on delivery of this charter. The Charterers to arrange/supply lashing materials, (except ordinary tear and wear in which case Owners to arrange/supply at their account.) log loading and discharging materials shall be at their account throughout this charter. In any case vessel to be redelivered with about same quantity of loading and lashing materials as on delivery.

76. Cargo Securing Manual

The Owners guarantee the Vessel to have on board CSM (Cargo Securing Manual) comply with 1994 amendments to SOLAS, 1974 regulations VI/5.6 and VII/6.6. Notwithstanding anything to the company in this Charter Party, the Owners to remain fully responsible for any and all consequences of their failure to comply with the requirements of this clause.

77. <u>Owners' Expenses</u>

Charterers are allowed to withhold USD 500 per port from the hire payment for estimated Owners' expenses.

78. <u>Certificates</u>

Owners confirm that all certificates on board must/will comply with international trading and local regulations/requirements including ISPS, ISM / Safety Management Certificates, failing which Owners to be responsible for all consequences damages it may incurred.

**Peter A. Junge**

| | |
|---|---|
| **From:** | Niels Klaris [tkb@tkb.dk] |
| **Sent:** | Wednesday, September 12, 2007 11:05 AM |
| **To:** | tkb@tkb.dk |
| **Subject:** | RE: BENEFIT WISDOM |

```
FROM: T.K.B. SHIPPING A/S
DATE: 12-09-2007 17:04:59
REF : NK1559507

peter/niels

re benefit wisdom

kindly find copy of withdrawal notice rcvd fm owners on the 11th of sept at 1058hrs danish
lt

quote

RE : MV. BENEFIT WISDOM / TKB CPDD 23RD MARCH, 2007

GOOD DAY,
FOLL RCVD FROM OWNRS.

= FULL QUOTE =

RE : (IMPORTANT) MV BENEFIT WISDOM / TKB - WITHDRAWAL NOTICE FM H/OWNRS

WE REGRETFULLY RECEIVED FLOWG "WITHDRAWAL NOTICE" FM HEAD OWS OVERNIGHT WE RESERVE OUR
FULL RIGHTS AS PER BTB CP

QTD

Thanks for chtr's msg. The alleged claims by chtrs is totally non-valid

and  in breach of the contract, shipowners hereby declare "withdrawal"
of
the  subject vessel from the employment as per the governing cp.

Thanks & best regards.

UNQTD

QTD

FURTHER TO OWNERS' LAST MSG, PLS ASK CHRTRS TO PROVIDE THE SUPPORTING VOUCHERS OF THE
BUNKER R.O.B. SO TT OWNERS CAN ARRANGE THE REMITTANCE ACCORDINGLY.

UNQTD

TKS N B.RGDS

= FULL UNQUOTE =
```



EXHIBIT "2"

```
unquote

best regards
niels klaris
```

## Reception_cph CphReception

| | |
|---|---|
| **From:** | Niels Klaris [tkb@tkb.dk] |
| **Sent:** | Tue11. Sep 2007 14:38 |
| **To:** | tkb@tkb.dk |
| **Subject:** | benefit wisdom |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Blue |
| **Attachments:** | _0911142520_001.pdf |
| **Handled by:** | TKL/MBL |

FROM: T.K.B. SHIPPING A/S
DATE: 11-09-2007 14:38:28
REF : NK1557332

mbl/nkl

re m/v benefit wisdom - withdrawal of vsl.
---------

ref telecon & rule b attachment,

will notify barwill worldwide to keep lookout for vsl's whereabouts.

will also notify ow bunker and danbunkering too.

have attached copy of last two hire payments done to jh shipping co ltd.

chain: Wisdom lines/ japanese broker /samsun /jh shipping/ tkb

fixed vsl via broker Ursachart S.A." <operation@ursa.gr>

headowners email address is:

Wisdom Marine Lines S.A. (Mike Chao)" <owner@wisdomlines.com.tw>

based our calculation on withdrawal notice of today 11th of sept at 1058lt danish time.

we have calculated as followed.

```
- overpaid hire 11th to 15th sept          usd 61,725.97
- overpaid c/r/v                    usd   200.00
- est bunkers on redely
ifo 610mt                          usd 189,100.00
mdo 52mt                         usd 30,160.00
- loss of earnings, 6/9 to 30/11 at usd 11,000 nettday usd 935,000.00
- detention fine for tessport                usd 378,000.00
-----------------------------------------------------------------
total                    usd1,594,185.97
```

EXHIBIT "3"

OWNRS' FULL STYLE : JH SHIPPING CO., LTD.
OWNRS' BANK DETAIL :
KOREA EXCHANGE BANK INSADONG BRANCH,SEOUL,KOREA
BENEFICIARY : JH SHIPPING CO.,LTD.
SWIFT CODE : KOEXKRSE
ACCOUNT NO. 650-004633-387(USD)